Good afternoon, Your Honors, and may it please the Court, I am Joseph Brooks from the FDIC's Appellate Litigation Unit. I would like to try and reserve two minutes for rebuttal. As the Court is aware, there are a number of issues in this case, all dispositive, and I will take my cue from the Court's questions, but beyond that, I intend to briefly address the jurisdictional issues and to spend the bulk of my time on the merits issues. The first jurisdictional issue, which is raised by the other side, is a suggestion that the FDIC's Notice of Appeal was untimely under Rule 4A because it was filed more than 30 and less than 60 days after. The question is whether the FDIC is an agency within the meaning of the good jurisdictional statute and unless the Court wants you to spend a lot of time on that, any idea? Feel free to pass on. Sure, Your Honor. I'd simply say I believe we're obviously a United States agency. The FDIC has raised a subject matter jurisdiction of more substance, and that's the question of whether or not the preference claim here by the holding company is subject to FIREA's exhaustion requirement. And we believe it clearly is, Your Honor, because under 1821d13d2, the governing statutory provision, the claims here for these tax refunds that are in the hands of the FDIC through proper means. But if we agree with you, I think that eviscerates Parker. I don't believe so, Your Honor, and let me start out why. I believe even on its own terms Parker does not foreclose the exhaustion here, and that's because what Parker said was you cannot be in the FDIC claims process if you're a debtor. Now, what they meant was not a debtor in the bankruptcy court sense, but they meant a debtor to the FDIC or the bank. And so what the Court said, which really just summed up its holding, was that unless the FDIC's proof of claim exceeds, exceeds. You know, this is a lot of stuff. But I don't understand the exceeds thing. I tried to trace that down, and from what I can tell, there is a provision. You didn't explain this at all. Well, why don't you tell me why it would make a difference, whether it exceeded it or was just to set off. I really think, Your Honor, and I've thought about this a lot myself, I really think it's a simple concept. All the Court was saying, I believe, is that unless the FDIC's proof of claim, what the FDIC is seeking from the debtor, exceeds what the debtor is trying to require in the preference. Unless the FDIC exceeds that, it is impossible for the debtor to be a, quote, debtor on its FIREA claim. In other words, the debtor could never be in a position, if it had filed the claim it should have filed, where it could end up ending money to the FDIC in that proceeding. So the debtor is simply trying to recover money from the FDIC. And the concept is, if you want to get money from the FDIC, you have to go through the claims process. What I understood it to mean was that there is a provision in the Bankruptcy Code, which applied there and, as I understand it, is also relied on here, that says that if there is a preferential transfer, and the person who made the preferential transfer also is a claimant in the bankruptcy, their claim cannot succeed unless the preference money is returned. And that is relied on here, it was relied on there. And the notion seems to be that it is kind of tied in with the affirmative defense notion, that it is therefore an affirmative defense to the claim because if it succeeds, the claim goes away. And it is exactly the same here. I mean, I think there is no cognizable difference that I can see in terms of how it operates, why they said it mattered, that it was more. In other words, there had to be a set-off. It couldn't be less than, because that wouldn't do it. Your Honor, beyond the explanation I offered, I don't understand beyond that myself. But I could go on. There are other reasons. And then you also do this subsection 1 and subsection 2 thing. And that doesn't seem to me to work at all, because if you go back to the case in which you got that from Benson, I think it's called. Yes, Your Honor. It made a difference there because as to what the claim that was being made, because they were claiming that it mattered who the defendant was. And they said, well, no, it doesn't matter who the defendant was because this is a subsection 1 instead of subsection 2, or vice versa, I forget which. But here, again, what possible difference could it make, whether it's subsection 1 or subsection 2? Well, Your Honor, this Court said in Benson and also in Rundgren that second- I'm sorry, what? This Court said in the Rundgren case, R-U-N-D-G-R-E-N, and also in Benson, it said that D-2 must be interpreted by its plain language. And there's no question that regardless of the conclusion you reach under D-1- But D-1 has to be interpreted according to its plain language, too. That's fine, Your Honor, but the statute says-  Well, they are different here, Your Honor, because the statute says or. And so what the statute says, if you satisfy either the language of D-1 or the language of D-2, then you have to have the exhaustion remedy apply. And all I'm saying is, as this Court made clear in Benson, you apply the language, the plain language, to what it means. It cannot be disputed that this claim- I really think the government could do better than this. Your Honor, I'd like to- Ones and twos are ones and twos. They don't matter. Your Honor, I'd like to move on, then, to help the Court with the merits. And I think these are a couple- I'm not done with this jurisdictional stuff. Sure, Your Honor, I'm glad to take questions. I struggled with trying to figure out what we do with Parker, even what Parker means. The conclusion that Judge Hall writes says, at least where we have the offset such that the balance is such that there's no claim, at least there, there's no exhaustion required. But the body of the opinion speaks a very different language. And the body of the language says, basically, if you're talking preference, there's no exhaustion required, because that's within the specialized knowledge of the Bankruptcy Court, and we don't think the administrative agency is really the right way to go there. And then Judge Fletcher, the other Judge Fletcher, writes separately to say, basically, I think it should be decided on a narrow basis. And as I read Judge Hall's opinion, the narrow basis is exactly what she did in the conclusion, which leads me to wonder, well, maybe Judge Fletcher thought it was broader than that. First off, so I'm puzzled with Parker. But I want to come back to my original question. As I read, I'll call it I.I., D.I.I., and then D.I. D.I.I. talks about acts or omissions, irrespective of who's making a claim. D.I. talks about who's making a claim. And there may well be some overlap, but I do think those are different. But it seems to me that if your reading of I.I. is the right reading, that is to say that a claim relating to any act or omission of such institution or the corporation as a receiver, there's not much left of Parker. Well, I believe that that's probably true. What is left of Parker? I suppose the affirmative defense part of Parker, which doesn't apply here. This is not an affirmative defense. Your Honor, the language in their brief is, this is how they describe their claim in this case. Quote, this is on page 46 of their brief, the F.D.I.C.R. seized control of the payment owed to the holding company by the I.R.S., unquote. If that is not an act or omission of the F.D.I.C.S. receiver, I cannot conceive of one. So there's no question but this case falls squarely within the language of D.I.I. Tell me why this is any more or less an affirmative defense than Parker. Well, it's not an affirmative defense here at all, Your Honor, because Affirmative defense to the claim, no, in the bankruptcy. Well, Your Honor, where we are right now is the F.D.I.C., acting pursuant to I.R.S. regulations, has $8 million in it. I understand, but you also made a claim in the bankruptcy. Well, the claim is very clearly stated, and it's even admitted in their complaint. It's a reservation of rights, and it simply says this. We have these refunds. We have no claim. But if and only if and only when a court should decide that we somehow shouldn't have these refunds, that they belong temporarily for a five-day period, if you will, to the holding company, then we have a claim for our pro rata share. But we're not seeking our pro rata share if we're rightly having these refunds as we got them directly from the I.R.S. So it's not an affirmative defense. It can't be because our claim doesn't even come up. Affirmative defense, right? Excuse me? It's contingent on there being the money somehow being attributed to them, and then it would be an affirmative defense. Sure, Your Honor. We would never seek our pro rata share if we have 100 percent of it, which we believe we do. Your argument is you have 100 percent of it subject to some argument from them based upon the agreement, however much that might produce. But that's very different from your having to seek it out of the bankruptcy as a pro rata share. Absolutely, Your Honor. Absolutely. And so we believe that there is no subject matter jurisdiction here. All they had to do was file a claim. They didn't do it. D2 controls in their own allegation that what they're suing about is this so-called seizure by the FDIC. So our view is very strongly, very strongly that FIREA required administrative exhaustion here. It's clearly a subject matter jurisdiction statute. This Court has recognized that time and time again, and that should be the end of the matter. But I'm perfectly happy to go on and talk about the merits of the case because in the event that the Court should reach them, I think that our points there are very strong as well. But, Judge Fletcher, you had indicated that you had some concern. I'm happy to talk about the merits, too, but I wasn't finished with jurisdiction. Sure, I'm happy to talk. I'm not sure I'm ever going to be finished with jurisdiction. Well, Your Honor, I'm pressed with time, and I don't know. I want to spend my time. I would like to hear the merits. Okay, I want to spend my time on what the Court wants to hear. On the merits, the first and most important issue, I think, is that it's very clear this case has underlying bankruptcy law and income tax law issues, but it's principally a contract law case. And it's a contract law case that involves a well-established default rule, the Bob Richards Rule. And that rule is a simple one. Whoever paid the taxes, earned the income, and suffered the losses gets the refunds, absent an explicit agreement to the contrary. So the first issue is, okay, it's common ground here that if the Bob Richards Rule applies, the FDIC gets all the refunds. Why wouldn't the Bob Richards Rule apply? Well, they say that their tax allocation agreement is an explicit differing agreement. The problem is the tax allocation agreement says absolutely nothing about the circumstance in front of this Court. It says nothing about any situation other than if the holding company receives the refunds from the IRS. If the holding company doesn't receive the refunds from the IRS, the tax allocation agreement says nothing about it. And you don't have to take our word for it. That's what the language says. The language doesn't address it. But equally importantly, the holding company's former president and CEO, who signed the TAA, he testified that the parties did not contemplate the circumstance where someone other than the holding company would receive the refunds, and indeed he testified that they specifically never contemplated what would happen if the FDIC received the refunds. This agreement has nothing to do with the situation before this Court, and because there's no agreement that covers this, the Bob Richards Rule applies. Now, their only response to this, because they don't address the language in the contract and they don't address the testimony of their own former officer, what they say is, well, the TAA gave us the right. It gave us the right to receive the refunds, and that's just as good. And the Bankruptcy Court said that as well. So initially this case turns on whether the tax allocation agreement gave the holding company the right to receive the refunds. Well, Your Honor, you can read that two-page document top to bottom and left to right, and there's nothing in there, there's nothing in there that gives them the right to receive the refunds. They only receive the refunds, as this Court said in Bob Richards, because the IRS's tax regulations require, in the case of a consolidated tax refund, that the refund, whoever it belongs to, must go in the first instance to the parent company. And that is for the convenience of the IRS. That's why they receive the refunds. But even if we indulge them, and even if we say, sure, Your Honor, please. I see the force of what you're saying, but I wonder about the following. Subsection 1 of the agreement says, a U.S. consolidated income tax return shall be filed by the parent for each taxable year. And here that's not what happened, right? Right. The FDIC filed it. Now, I understand there's a statute, an amended return, but it's still a return for a year. That's correct, Your Honor. So is that consistent with the agreement? No, the agreement doesn't apply if the FDIC filed the return. And there's an important point to be made here, Your Honor. It doesn't apply because the statute permits it? No, no, it doesn't apply because the language of the contract doesn't address it. The language of the contract doesn't address it. I just read you. It says, a U.S. consolidated income tax return shall be filed by the parent for each taxable year. Correct, Your Honor. And so if a U.S. Read that as saying, and not by somebody else. Well, Your Honor, under the IRS regulations, the parent, in this circumstance, when you have a failed financial institution that's part of the tax group, the parent could have filed a tax return. The parent and the FDIC both could have filed it. Either one of them could have filed it. And it's because there's a statutory override, essentially. No, no, it's not an override. The only reason why the parent didn't file a tax return here, I presume, is because they didn't think it was worth their while. There is nothing in the IRS regulations, there is nothing in anything that the FDIC did that prevented the parent from filing the return. But, Your Honor, the critical issue is because even if, under the regulations, and they're all in the back of our brief, you can find them there, I think, page A7 through A10, even if the holding company had filed the tax return, the refund still could have gone to the FDIC. And here we know there's no problem with that because a picture or perhaps a word picture is worth a thousand words. I would direct the Court's attention to Volume 2 of the excerpts of record, page ER 115. On April 5, 2011, more than two years before the bankruptcy petition was filed, this letter was written by the holding company, it was sent to the Internal Revenue Service, and it was copied to the FDIC. And I will concede at the beginning of this letter, the holding company says, we object to the FDIC being the agent. They do say that. But then they come down and they talk about a tax return is coming, there's going to be a large refund, and all of it, most of it goes to the FDIC. And then they said this, Your Honor, quote, we acknowledge that the FDIC is the receiver of Venture Bank, a former asset of Venture Financial Group, and we plan to soon file a 2009 tax return which has a large refund due. Most of that refund will go to FDIC as receiver of Venture Bank. And here's the clincher. And we have no objection to their portion of the refund being paid directly to the FDIC, unquote. Your Honor, from this day forward, there could be no contention that they had any problem with the FDIC receiving the refund. They could not have more clearly waived this than they did in this letter. And so this notion that somehow they had a right to receive it. The problem, of course, is that that's before they were in bankruptcy, right? Well, that's not a problem, Your Honor. Well, it's a problem because the trustee has a different view because he wants to get the money back for the estate, right? Yeah, but if this is a waiver as a matter of law, these are the rights and this is the state of play two years before the bankruptcy petition was filed. It's not within any preference period or anything of that sort. And so this is, in essence, as a waiver. It's a modification of the contract. It's a change of the way things were going to be done. And the other thing beyond that, Your Honor, it makes sense. It makes sense. All that the TAA did was give the holding company five days to turn around and pay these refunds back. There's nothing in the TAA that suggests that they had a right to keep them for themselves. All they had the right to do was receive them. And if the music stopped during that five-day period, then maybe the bankruptcy law had some implications. Okay. The music just stopped. You have failed to save your two minutes. With our assistance, you've gone over. Let's hear from the other side, but we will give you a chance to respond. Thank you very much, Your Honor. Good afternoon, Your Honors. May it please the Court. I'm Andrew Morton on behalf of the trustee, Mark Waldron. Your Honors, I'd like to focus first on the merits issue that we ended with just now. I think the decisive point on that issue that I'd like to address first, and that really I think resolves the receiver's various contentions about why it is that the construction of the tax allocation agreement solves these issues in favor of the trustee. The decisive issue is that the bankruptcy code, the provisions of the bankruptcy code, rendered all of the debtor's interests, broadly construed interests in property with respect to the tax refunds, as property of the estate and recoverable as such during the preference period. Once it was that the bankruptcy court determined and established through findings of fact that the tax allocation agreement did not create an agency or trust in favor of the bank with respect to the debtor's interests in the tax refunds, and rather it gave the bank instead only a contractual right of payment from the debtor. Well, but that's the question, not the answer. That is the question, and that's — You're saying it's a question of fact, subject to clear error of view, or what are you saying? I'm sorry. The question of what the tax allocation agreement created, whether it was an agency or a debtor-creditor relationship, I mean, that is an issue. Well, why does it have to be either? I mean, as I understand the argument on the other side is essentially it was neither, that it was an agreement that dealt with one set of circumstances and not with this one. That's exactly right, Judge Burrs. On their argument — They call it an agency or a fiduciary or a trust or anything else. It just doesn't cover this. That is their argument, is this notion of scope, that it doesn't apply, right, and so it doesn't matter. But the point I'd like to make is that, in fact, it does matter because it's a question of timing. And the reason is this, is because under Section 541 of the Bankruptcy Code, A1, that defines property of the estate broadly to include all legal or equitable interests of the debtor in property, as of the petition date, and A3 goes on to add that it brings into the estate any interest in property that the debtor recovers through a preference action. And so this Court, the Ninth Circuit, has recognized in the Boyan Reserve case that's cited in our brief in the preference analysis that the construction of interests of the debtor in property for purposes of preference and for 541 property of the estate are coextensive, meaning that property that would have been part of the property of the estate immediately prior to a transfer during the preference period is subject to preference law. So then the question is, well, how broad is that? In other words, did the debtor have an interest in property, being the tax refunds, prior to the transfers during the preference period? And the answer to that question is yes, because when we look back at that point in time, the scope of interest in property is extremely broad. And this is discussed at some length in the IndyMac report and recommendation adopted in full by the District Court in that case, which points to several decisions of this Court, noting that future rights and expect... I'm sorry? I don't know where you're going or what you're talking about, so maybe we should... Well, I think your question was, why does it matter how we construct the tax allocation agreement? And the answer is the... I didn't say why does it matter. I said that why does it matter? Why do we have to call it an agency or a fiduciary? Why can't we simply say that the background default rule applies because there's nothing to the contrary? Well, because the answer is that construing the tax allocation agreement tells us whether there was an interest of the debtor in the tax refunds, and if there was. In other words, what the receiver has done is sort of tried to turn this on its head by saying, well, what we need to do is kind of look only sort of at this future point in time after the receiver had come in and after these consolidated returns were filed and so forth. But, in fact, what's really going on here, and this is explained both in the bankruptcy court opinion below here and in the IndyMac case, is that the predicates of the refunds that were eventually paid by the IRS during the preference period are sufficiently rooted in the pre-bankruptcy past such that they would be estate property. And the way that they would not be estate property is if the tax allocation agreement created an agency or a trust. In other words, why couldn't it just be that the tax allocation agreement does not supersede the Bob Riches rule because there's nothing in it that does? Why do we have to call it an agency or a fiduciary or anything else? Well, the tax allocation agreement, I think, doesn't need to supersede the Bob Richards rule per se. What the Bob Richards rule suggests is that if there is a tax allocation agreement in place, then... To the contrary. To the contrary of which... Well, which leads to... Switches the ownership. Yes, which leads to a differing result. Why in this tax allocation agreement switches the ownership? Well, that's just it, is that under state law, Bob Richards says, if you've got this agreement, go look at it and construe it under state law. And that's what the bankruptcy court did here. And under state law, the agreement has to affirmatively create that agency or trust for the expectancy of the payment that the debtor has. So, in other words, the debtor here is expecting a tax refund coming from the IRS. And within the world of bankruptcy, even that future contingent unmatured payment from the IRS would be treated as property of the debtor. That's the background rule that's operating here. And so then the question becomes, yeah, but is the debtor's interest in that property instead so remote in that it's only an agency or as a trustee that it has that interest in property? That's what would take it outside of the reach of the property of the estate. And so I would submit that, in essence, it works the other way around in that the reason we have to construe the tax allocation agreement. How I understand the Bob Richards rule is that whether they expect it to get the money in their pocket or not doesn't determine the ownership question. And that the ownership is in the person who created the refund right, essentially. In this instance, the sub. Unless there's something in the agreement to the contrary. So what in the – is that an erroneous understanding of the Bob Richards rule? Judge Berzon, I believe it is. Why? The reason is because – Bob Richards rule is not directly – doesn't operate only in bankruptcy as I understand it. Is that right? Does it operate only in bankruptcy? I don't know that it does. I haven't thought about that. I'm sorry? I don't know that – I don't know, Judge Berzon. And it is a rule about ownership. You're telling me that there was some ownership-like interest in the holding company before the bankruptcy, but that's the answer. That's the question, not the answer. Was there? Yes. Yes, there was. Because why? Because the default rule is there wasn't, even contingently, unless there is something in the agreement to the contrary. So I still want to know what's in the agreement to the contrary. Your Honor, I would submit that – I guess I disagree with the way that the Bob Richards rule applies. And this is actually, in an interesting way, addressed, I think, in a manner favorable to the trustee in the American financial case out of the Sixth Circuit, which actually the receiver cited. And in the concurrence there, it kind of talks about, well, how is it we should deal with this situation? And what I think you're suggesting, Judge Berzon, is that the Bob Richards rule kind of be used to fill in, for example, an ambiguity or silence under a contract. Exactly. Yes. I don't think it says that, Your Honor. I think what it says is, initially, and it uses this language in kind of two different parts, but up front what it says is, well, we think that if there's no agreement whatsoever between the parties, then we're sort of going to assume, kind of as a common law rule of equity, we're going to assume that they would have agreed to an agreement that would create a trust. Now, what happens here is, no, there is an agreement. And so what the Bob Richards rule says, oh, wait, so there's an agreement between the parties that is intended to deal with their rights and interests in tax refunds. Go look at that agreement and construe it under state law, and that's it. So then that's what the bankruptcy court did here, is it construed the agreement under state law. And this is where I think the difference is and the disagreement is that the Bob Richards rule doesn't then sort of continue to kind of create a presumption, for example, of a trust relationship or something like that. It just simply says, oh, if you have an agreement, go construe it under state law. And under state law, Washington state law and the law of many other states, is essentially kind of the inverse of this, what would happen in the absence of any agreement, which is the agreement needs to affirmatively give the payee, the creditor, as we would say, it needs to affirmatively give them that interest in the forthcoming payment that's due to the debtor, meaning that the Bob Richards rule has no application. The question is, under this agreement, which says what happens to the money that's coming from the IRS, the question is, or I should say the issue is, if it doesn't turn the debtor here into an agent or a trustee, then the only rights that the bank can have in the forthcoming payment, or I should say it doesn't actually have any direct rights in the payment, that's the point, and that's what the Bankruptcy Court dealt with and that's what the IndyBank decision deals with, is that unless the agreement affirmatively gives the bank a direct right in the forthcoming payment itself by creating an agency or by creating a trust relationship, if it doesn't do that, then that means that the debtor owns it. Why? Because nobody else does. And so that's, I hope that answers your question, and I understand what you're saying, which is that, well, yeah, but if we were to kind of fill in what seem to be silences or ambiguities, and I should add here, too, that the Bankruptcy Court did not think that the agreement was ambiguous on this point, again, as a matter of state law, because state law simply assumes, essentially, a background rule that, in a sense, could be thought of as the opposite of Bob Richards, which is that it assumes that the recipient, the payee of a payment, owns that payment, owns the right of payment, owns the money when it gets it, unless the payee is an agent or a trustee. You know, you still haven't talked about jurisdiction, and time is running. Yes, I understand. Would you respond to the following? Why is there no exhaustion required under DII? That is to say, why is this not a claim relating to any act or omission of such institution or the corporation of the receiver? Because this strikes me as falling exactly under DII. Yeah, you know, I understand the point there, and I guess the response to it is a couplefold. First is that the second subsection, relating to an act of a receiver, when you look at the cases that deal with those, all of the actions and claims in those are not NREM-type actions like you see in a bankruptcy preference action, but rather are actions for things like lender liability claims and that sort of thing. So? So the first comment is… It sounds like it's still like a claim. NREM claims are claims. Yes, it is a claim, but what I mean is it's a claim that really only falls under subsection 1 and not 2. No, subsection 1 and subsection 2 are connected by the word or. Yes, they're connected by or, but what I mean is that… Well, if it falls under 1, it could also fall under 2. Yeah, and that is what… Well, I'm asking you, why doesn't it fall under 2? I'm saying it doesn't fall under 2. All right, suppose it does fall under 2. Suppose it does fall under 2. So supposing it does fall under 2, I guess the first comment is the Parker exception, and the Parker exception doesn't draw a distinction, I don't think, and I recognize that it does… And the only issue in Parker was what one did because it was a claim against the FDIC. Well, it was a claim against the assets. Yeah, and so it mentions… Well, claiming it's the assets. It was a claim against, as it says here, from a depository institution to which the corporation had been appointed a receiver. So it was a claim against. Right.  Right. But that's the only thing that was discussed in Parker. Subsection 2 was not even mentioned. The question is, I think, was there any reason for Parker to discuss subsection 2? I don't know that there was, but I guess I also read the… Wasn't that the answer? It doesn't address subsection 2 at all? It doesn't explicitly address subsection 2, but I think its rationale does,  which was affirmed, in essence, by the McCarthy court, is that if you have a preference action in bankruptcy, then it is not subject to exhaustion under FIREA, and there's no… No, that's not what Parker says. Parker says a lot of stuff, but it doesn't quite say that. Well, I think the concurrence suggests that the majority holding is actually quite broad and may, in fact, encompass that. Then when I read the actual holding, the part that says, in conclusion, it says at least, where the offset that would be the claim is smaller than the amount that is owed. Yes, that is what it says at the end. That's the conclusion. And it says at least. It doesn't say beyond that. Well, what it says is we hold that a preference action in bankruptcy is not susceptible of resolution under FIREA, at least where, and you're correct that what that would go to is if you read the holding as kind of being constrained to just that, it essentially is, in a way, the extension of the Midwest decision that it relied on for additional support, and that was kind of the point of the concurrence. And so I think you're right, Judge Fletcher, that it is a little bit confusing, because if all Parker really held was, well, we're going to treat this as an affirmative defense, which I should add, by the way, this case falls under that as well, inasmuch as there is a claim that is exactly equal to and offsetting. I'm not quite coming to grips with my question, which is a really simple question, which is to say why does not this case fall under subsection II? Well, I think section II can be read that way. I'm trying to figure out why it can't be read that way, because that's your argument. So why do you say it can't be read that way? Well, I think as we've addressed in our briefs, and I say I'm over time here, but I want to answer your question. I'd like to hear your answer. That's okay. We have argued that it shouldn't be construed that way, because we think the distinction that's drawn here is that, look, this really is an action that is not directed in an act of the FDIC. Let's go back again. Let's assume that II applies. Yes. What difference does it make? I mean, I understand that Parker wasn't about II. Yes. What is there about Parker that could possibly be different if it was about Joe? In this case, I think there is no difference. And the reason is, and I think you touched on this during the opening. Why are you fighting on this particular ground? It seems a little odd. But anyway, go ahead. I think you better fight on it, because my question goes, I'm ruling against you on jurisdictional grounds. So you better can – well, I don't know about my colleagues. We've not consulted with this ahead of time. But if this is covered by II, in my view, we do not have jurisdiction. So I guess, you know, that's what we've argued in the brief. That's why we've argued it. Your argument is really based upon sort of the underlying premise of Parker. Yes. It's throughout the opinion, but it doesn't get to the conclusion. But the premise is that any preference argument belongs in the bankruptcy court, and the agency is not capable of dealing with it with any good sense or sophistication. Well, that argument is made, and I want to kind of answer both your questions. I think maybe to help frame your question, Judge Fletcher, to you, Judge Berzon, it doesn't make a difference in this case, we think. And the reason is because even if Parker were read, and we don't believe this is the correct way to read it because this was the whole point of the concurrence, but even if Parker were read as essentially just a narrow holding, the way the concurrence would have come out, which is, I would just extend the Midwest decision to those preference claims that are treated as affirmative defenses because there is a claim that's been filed in the same amount, that is this case. In other words, Parker says, in addition to the things it says about policy and its initial construction of the statute, it says, well, we think where there is a claim filed, a proof of claim filed in the case, that a preference action is an affirmative defense to that claim to the extent of the claim, and that also resolves. Within the meaning of subsection DI, which is a claim against FDIC or RTC, it's not any claim, it's a claim against RTC. That's I. That's the premise for the operation of I. It is a claim against the RTC or the FDIC. Subsection II has a very different premise. Subsection II is based not upon the fact that there is a claim against, but is based rather that there is an act or omission by. By the receiver. It's possible that something is covered under both. I get that. But the word or connects the two. So if you have either one or the other, exhaustion is required. That's how I read the statute. Yes, and my response to that, which was a partial response to Judge Berzon, was that the way we read Parker is that that portion of the holding that deals with the affirmative defense would, in fact, apply to subsection II, even though Parker doesn't call it out specifically. Even if it applied to subsection II, this is the last question, I hope, your opponent's last argument was that this isn't actually an affirmative defense because the claim here is essentially a contingent claim that is only for a claim if it turns out that the So the money is sitting with the FDIC, and that's different than Parker. And so this is not, it's not that the FDIC is going in and saying we have a claim for this, let's say it's $10 million, whatever it is. We're making a claim for $10 million. They're saying we have the $10 million, and only if you first determine that it's a preference do we have a claim. So, therefore, what we have here really is an affirmative claim against the FDIC and not only an affirmative defense. What about that? Well, Judge Berzon, I think all I can say to that is that that is kind of inherently the nature of a preference action. In other words, the only reason there is a preference action against the FDIC is because it has the money, right? So, I mean, right, so if it didn't have the money, there wouldn't be a preference action, and they would have filed a claim, but then. In the other case, they actually did file a claim because there was additional money. That's right. They said was due them. Right. That's presumably why there's the qualification in the holding, because there was actually, no matter how the preference claim came out, money due them. Right. Well, and that's also why in that case you would always have a claim that would be in excess of the amount of the preference, right? But, again, I guess the way I sort of understand the Parker decision is that the fact that, and the concurrence kind of touches on this, too, is in that case, you know, the preference action was filed affirmatively, and I think even before the proof of claim was filed. And now the majority did something kind of interesting where they said, well, later, though, the claim was filed, and then that kind of transformed it into an affirmative defense to the extent of the claim. But the claim there would have incorporated, in addition to the other monies claimed, the amount of the preference. Again, just like here, still a contingent amount, right? And the concurrence delves into this a little bit kind of saying, well, it seems to me like what the majority is holding is that perhaps the trustee could affirmatively pursue anyway, you know, even if the claim hadn't been filed yet. In other words, if the claim were filed later subsequent to the preference under the bankruptcy rule that allows that. Let me ask you a question. Does D-1 even apply here with respect to the preference claim against the FDIC? So D-1 is, I mean, we've argued D-1 is the only one that applies. Well, let me read to you from Parker. I'm on page 1154, run over paragraph that in the second column. This is Judge Hall, so it's the majority opinion. I'll wait until you get to it. Okay. I'll wait until you get there. But it's page 1154, second column, end of the run over paragraph from one column to the next. Tell me when you get there. Yeah. Okay. Judge Hall writes, if the preference action is meritorious, the ROTC has no asset and FAREA does not apply. Right. She says D-1 doesn't apply if, in fact, it's a preference action. That's how I read that sentence. Right. Yeah. So it sounds like D-1 doesn't apply because that is to say this is a preference action, and you're thinking you want to succeed, but your very premise of you succeed means that it doesn't apply.  So D-1 doesn't apply. Well, so. So only D-2 can apply. Well, yeah, I mean, that's right in a sense. Well, if that's right then, it sounds like all I have to do is look at D-2, and if D-2 applies by its own terms, the game's over and you need to exhaust. Again, we don't concede that for the reasons we've discussed in the brief, but your point is taken that that is part of the upshot of the holding, and that's why the bankruptcy court concluded here under Parker with respect to D-1 that, well, in order to figure out whether D-1 applies, I first have to figure out whether there is an asset, because that's what D-1 talks about, an asset of the receivership that is being sought to be recovered, and the way I answer that is by resolving the preference question, because if there was a preference, then the receivership doesn't actually own the asset that it's hold and D-1 doesn't apply, so there's no bar. And that argument also tells you that D-1 doesn't apply, according to Parker. It wouldn't in the instance of a successful preference action. That's right. Well, and, of course, you're saying it's a preference. You have conceded by your argument that this is a successful preference action that D-1 doesn't apply. That is to say, if you succeed on the merits, that means D-1 doesn't apply. Correct, and the court would then have jurisdiction. But my argument is, okay, so D-1 doesn't apply. I'm totally with you. It may or may not, but I'm totally with you it doesn't apply. I'm not sure there's anything that you have more to say, but D-1, the language is really clear to me. This is a claim that arises out of an action by the FDIC. Are you telling me that filing the tax return… You mean D-2? D-2, I'm sorry. D-2. So are you saying that filing the tax return doesn't count as an action? I mean, what are you telling me? Well, again, we've made, again, a couple of observations about that, one which I recognize that, you know, you're not so concerned about, which is we've said even if it did apply, we're fine. But to the extent that that's not the case, in other words, if jurisdiction turns solely on does this or doesn't this apply, what we've argued, and I think when you look at the cases that kind of deal with D-2, is that D-2 is concerned not with a situation here where, in fact, although the basis of the preference action arose out of the fact of a transfer, the transfer, as it was, was made by the FDIC in its capacity as this alternative agent. And what it's directed at, what the action is directed at solely, is not the notion that the FDIC as a receiver here did something wrong or that its acts gave rise to some kind of liability like a breach of fiduciary duty, as you see in some of these other cases. Instead, it's an action directed solely at the possession of the assets in the receivership, and it could only be limited to the assets of the receivership. So. Thank you. Thank you. Now, we've taken the other side well over time, but you're already over time. Would you please put two minutes on the clock, and I'm not sure whether that's going to work or not, but let's start with two minutes. Your Honor, to hopefully close the loop on D-2, the FDIC couldn't more clearly or in any way differently state its position from the way that you, Judge Fletcher, have stated it. I know you speak only for yourself. On this notion that this doesn't arise out of an act of the FDIC, again, I can only quote page 46 of their own brief. Their claims all arise out of, quote, the FDICR seized control of the payment owed to the holding company. Now, at the outset of my brother's argument, he was talking about what happens here with respect to Bob Richards when you have a tax allocation agreement. As I said at the outset of my merits argument before, the Bob Richards rule is a default rule. That means in the world of contract law, if parties to a contract do not address the issue that's addressed by the default rule, the default rule controls. In other words, the tax allocation agreement doesn't give with respect to the FDIC. It can only take away, and the question is, did it do so? In the United Western Bancorp case, a published Tenth Circuit case, following an earlier Tenth Circuit case that adopted Bob Richards, the court said, what do you do to determine whether you have a differing agreement, as required by Bob Richards to set aside the rule? And the court said, when there is an agreement, the court must determine, one, whether it unambiguously addresses how tax refunds are to be handled, and two, if it does, whether it purports to deviate from Bob Richards, whether it's a differing agreement. Now, that case isn't even mentioned in their brief. But a case that they have now said that they like is the Amfin case out of the Sixth Circuit. And I would ask the court, if you only read one, go back and read one page of the briefs in this case, read page 40 of the FDIC's opening brief. Because what page 40 does is it simplifies this issue in the best way we know how. At the top of page 40, you will see quoted, paragraph 6 of the tax allocation agreement in this case. That is the only paragraph of the tax allocation in this case that addresses tax refunds. In a footnote at the bottom of that same page 40, you will see a provision from the tax sharing agreement in the Amfin case, a published decision of the Sixth Circuit. And what you will see if you read the two of those is that they are virtually identical. And why is that important? The reason why it's important is that because in the Amfin case, describing the language there, which, again, you can see from this page, if you look at it yourself, is virtually identical, the court said this, quote, this language, like the rest of the TSA, speaks only to the allocation of liability in the event of an adjustment, such as a lost carryback refund. It says nothing about the ownership of such a refund, much less unambiguously establish the parent company's ownership of the refund. Close quote. The Sixth Circuit went on to say, we reject the parent company's argument that the text of the TSA supported its right to the refund and agree with the FDIC that the TSA failed to address the ownership or disposition of refunds. Unquote. So what do you do in that circumstance? Well, in the Sixth Circuit, they indeed went and looked at state choice law and state contract law. Why? The Sixth Circuit said we don't adopt the Bob Richards rule. But, of course, we're not in the Sixth Circuit. We can read the case. Sure. You're over time. Anything else? Nothing else, Your Honor, except to thank the court for your time. Thank you.
judges: Tashima, W. Fletcher, Berzon